Good morning, Your Honor. Jacqueline Beatty. Imagine being the owner of a large construction project that you're undertaking that will occupy a full city block. You're going to build a high-rise hotel, condominiums, four to five floors of retail, shopping, restaurants, and underground parking garage. You're talking about Las Vegas, of course. Well, some people might consider Bellevue Las Vegas, but in that process you're going to use several general contractors and construction managers, and those folks are going to employ many subcontractors and suppliers. Imagine the risk management challenges that you face. How are you going to allocate the risk fairly and manage your own risk when so many people are working on the project for so long? Probably by contract. At least that would be part of the process, wouldn't it? How did Northwest come to perform the work on Lincoln Square? There's reference to a contract, but I don't see that one was produced, was it? I know there are lots of contracts here. There are lots of contracts. Northwest Tower had its initial experience at Lincoln Square sometime in January or February of 2001, and this was about a year and a half before the underlying accident. The crane work. Pardon me? The crane work. Yes. What Northwest Tower does is install, maintain, and dismantle cranes and personnel hoists. That's its line of business. And it was first involved in Lincoln Square sometime in January, February of 2001. And at that time, as evidenced by this document, which is ER 188 to 192, et cetera, they were asked by Bellevue Master, the owner of this project, to obtain additional insured status for it. This project had This is relating to the purchase order? No, Your Honor. This is relating to any work that Northwest Tower did on the project. Is that what it says in the letter? The letter that I'm referring to, well, it's a fax transmittal that the second page of which is a letter to SERS, but we know Northwest Tower received this letter because it sent the letter to its broker. And it says, Regarding the insurance requirements at Lincoln Square, and it goes on to detail that Northwest, just like every other subcontractor on the project, must name Bellevue Master as an additional insured on its policy. And Northwest did, in fact, communicate with JBL and K and Westchester and secure the additional insured coverage at that point. They did. And they renewed that coverage throughout the time they worked on the project as the project requirements required them to do. But at that point, that particular letter and that particular communication dealt with the contract entered into between Bellevue and Northwest, and there is a purchase order, isn't there, that is underlying that particular work? Your Honor, I would disagree with that. There came to be a purchase order between Bellevue Master and Northwest Tower, but that was not among the documents that Northwest Tower sent to its broker. And the reason for that is that the project documents as a whole, the insurance requirements for Lincoln Square, the construction conditions for each of the construction managers that worked on the project, all had generic requirements that applied to all subcontractors for the entire project that said, you must name Bellevue Master the owner as an additional insured in your policies. Keep in mind that owners don't typically contract with any of the subcontractors. The fact that there was a purchase order or two at some point, that purchase order, by the way, does not contain itself any additional insured requirements. Those requirements are set forth in the project documents as a whole. Well, they're set forth in those things that came on February 22, 2001, correct? Right. And those would be after, well after, the original deal, evidently, contract was entered into. I mean, a month later. If we look at the endorsement, which is ER 76, and I have copies of that if I can show you, it says who is an insured is amended to include as an insured the person or organization shown in the schedule. The schedule here says simply, as required by contract, provided the contract is executed before the loss. That reference to contract doesn't say the particular job that you're doing at the time. It doesn't say it has to be in writing. It doesn't say it has to be a single document. It can be comprised of many documents. In order to have an agreement between Bellevue Master and Northwest Tower, for Northwest Tower to obtain additional insured coverage for Bellevue Master, there has to be a meeting of the minds on two points, that Bellevue Master required AI status of Northwest and that Northwest agreed to provide it. It cannot be reasonably disputed that Bellevue Master required AI status of all of its subcontractors throughout the life of the project. It also cannot be disputed that Northwest agreed to that term. There was a meeting of the minds on that term when it sent the generic insurance requirements for the entire project to its broker. This language in the policy is not limited in any other way. It simply says once there is an agreement between the named insured, Northwest Tower, and the additional insured to obtain AI status for the owner, it's in effect provided that the liability of here, Bellevue Master, arises out of the named insured's operations. I know the summary judgment was granted without a hearing, but was that argument presented on the briefing on summary judgment before Judge Peckman? Absolutely. Americans' position in this regard? Well, absolutely. If what you're talking about, did we argue that the plain language of the endorsement? Covered everything. Covered everything. We absolutely did. We talked at length in our brief about several decisions by fellow circuits. One of those decisions is the Marathon Ashland Pipe versus Maryland Casualty. There's a situation where the subcontractor had agreed to erect buildings for the owner, and the endorsement actually said raid building erection. But the owner's liability arose out of mowing the grass, having nothing to do with the limitation, if you will, that was read into the endorsement. And the court said this language, and this would be analogous to saying, well, there needed to be a specific term in the hoist contract for the additional insured status. The court there said this does not limit Marathon's coverage as an additional insured to those activities relating solely to the construction of the buildings. An obscure reference, here it would be a reference that's not in the endorsement at all, does not adequately inform the additional insured of this potential limitation. The only limitation on Marathon's coverage under this endorsement, this blanket endorsement, which was issued by respondents in August of 2001, is that the liability has to arise out of the named insured's operations. At the time the hoist work was being negotiated, Northwest Tower received from its broker a schedule of certificate holders that was in effect at that time. And Northwest Tower went through that schedule writing no and yes to indicate which additional insureds were to be included in the policy renewal. They wrote yes next to Bellevue Master. At the time the hoist work was done, insured status for Bellevue Master, which is part of the overall risk management scheme, was already in place. There would be no need to go at it again because it already existed. If you think about the Swift case, for example, one of the arguments that respondents made below was, well, this was work that was done for another sub. Well, work done for a sub or a sub of a sub is ultimately work done for the owner, and that's made clear in the Swift case, where the court, again, said, you cannot read limitations into that blanket endorsement that aren't there. If I hate to interrupt the argument here. I would like to move, if I could, to the Rule 56-F issue. Sure. It seems to me that you would agree that on the motion to conduct further discovery, we really are on an abuse of discretion standard, correct? That is true. So if I'm to look on Rule 56-F, it seems to me that you're supposed to, as best we can, set forth the specific facts you're hoping to elicit from the further discovery, that the facts sought exist, that these sought-after facts are essential to resist the summary judgment motion. If I read other cases, I find especially if those facts are in the hands or subject of outstanding discovery or in the hands of the other party, that would be something I might find an abuse of discretion. Why do I find an abuse in this particular instance? Well, I think in the first instance, there is sufficient evidence in the record that summary judgment could be granted for American guarantee on the existence of an agreement to additional insured status for Belvier-Master. But that said, ordinarily. Nobody did that. Well, this Court could. Well, I understand we could, but nobody did. So let's move. What else? Such motion should not be granted if relevant facts remain to be discovered, and particularly if the facts are complicated. This is not a situation where we failed to timely conduct discovery. In fact, the discovery problems we had as a result of Northwest Tower and Westchester are documented in the Declaration of Barbara Brady. Was there any outstanding discovery from those who won in summary judgment? Was there any outstanding discovery from them? Yes. We had not yet obtained the underwriting files from Westchester. We had not yet deposed Mr. Weber or any of the other parties in the underlying litigation. We were not a party to the underlying litigation. I understand. We were an excess carrier. We weren't even defending that action. When we were first told that all of the documents relating to the project were in Northwest Tower's files, when we went to look at those files, which we were not given access to until six months after requesting them, they were incomplete. What they led us to were the existence of documents in other jurisdictions. We had to go, for example, to Oregon to get this fax transmittal from Northwest Tower to JBL&K. There would be questions that we would ask of Mr. Weber and Mr. Payne that were not asked in the underlying case because this was not an issue that was actually litigated and we were not a party. How much discovery was conducted then in the case once you brought the action? Why wasn't Weber deposed? What happened during those months? Okay. Well, when we filed the case, we initially sent out discovery right away to Northwest Tower and to Westchester. It took them six months to provide us with access to the documents. We looked at the documents, and then when they began to give them to us, it was piecemeal. Royal never answered, and, in fact, we took a default against Royal. Royal later appeared in May and at that time moved to set aside the default and then change venue to this court. As you know, once the matter's in federal court, there's a temporary stay. You have to go through the process of doing the order. So it wasn't until September of 2007 that we could renew our discovery efforts. And while we had events occur in this discovery process that suggested documents were being withheld or our discovery responses were not being answered, we were hoping to complete document discovery before deposing witnesses, and that's the usual course. There were still four months left to discovery, to which the parties had agreed initially when they agreed to a joint discovery plan at the time this motion was brought. I see I have 25 seconds left, and I'd like to say something if I can. Thank you. Counsel for Westchester. Good morning. William Olson on behalf of Westchester and on behalf of Northwest Tower. I'd also like to introduce co-counsel Russell Love, who represents Royal Insurance Company. Mr. Love and I are not splitting the time. I will address all the issues. I want to emphasize for the court two points that I think are important for the court to understand. The first point is that Bellevue Master expressly elected not to contract with Northwest Tower in April of 2002 related to the installation and dismantling of these Champion elevators. In the record, it's cited in the briefs, but if you look in the supplemental excerpt of records at page 110B, that's Bellevue Master's answers to interrogatories confirming the statement I just stated. Bellevue Master, instead of contracting with Northwest Tower, contracted with Champion elevators. Northwest Tower is a small company. They don't supply equipment. They simply provide labor to install and dismantle some of this equipment. Champion supplies the elevator. They're the equipment provider. The Bellevue Master contract with Champion was for the supply of the elevator and also the labor to install and dismantle. If Bellevue Master wanted to get additional insured coverage or indemnity, that was an issue for them to address with Champion. Champion, in turn, contacted Northwest Tower and arranged for Northwest Tower to supply the labor to install that equipment as a second-tier subcontractor. That contract was oral as to price, scope of work, and schedule. It did not provide for additional insured coverage. Judge Peckman pointed that out in her opinion very clearly. There was a proposal coming after the fact, after part performance. It was a lengthy 12-page subcontract. It was somewhat surprising to Northwest Tower because they don't deal with that level of sophistication usually, and they didn't accept it. But be that as it may, Northwest still had the policy with the two carriers, Westchester and the other initial carrier, in which they had made Bellevue an additional insured, and that insurance policy didn't have a limitation, didn't restrict it, did it, specifically to the framework? Yeah, there's two limitations. Judge Crowl, there's two limitations in the endorsement to the Westchester policy. Council intimated that there was only one limitation, but there's two limitations. First one is additional insured status has to be required by contract. So the threshold issue is, is there a contract providing AI coverage to Bellevue Master? In this case, Champion has now conceded that there's no AI coverage for them. But Bellevue Master is still here arguing, but where's the contract? We've been talking about this purchase order. This purchase order says right on its first page, this is a confirmation of a verbal order. And the purchase order itself also contains no express additional insured requirement. Council just acknowledge that during her argument. The purchase order also says on its attachment, if there's going to be extra work, a further order is going to be required. Bottom line is here, there's no contract with Bellevue Master providing AI coverage. And I'm maybe jumping ahead here, but Judge Smith, with your 56F question, no amount of discovery is going to produce that contract. It's as Judge Peckman observed. Well, my worry is, if you want to go to 56F, my worry is that as I look forth on 56F and determine whether a 56F motion is an abuse of discretion, and we've got to find an abuse of discretion, the law generally is that it would be an abuse where there's material that's outstanding, discovery request to the opposition that they can only get from the opposition. That's pretty much the case law says that is an abuse. That's why I ask her that. That's what I would ask you. If you had discovery still outstanding and you did not answer it, then it seems to me Judge Peckman can't give you a summary judgment until you do. Well, first of all, we didn't have any outstanding discovery. And second of all, there's no reasonable basis for believing that a contract exists as they're speculating or alluding to. This tower crane contract is a different matter. This accident arises out of the champion elevator work. There's no question, no dispute, that Bellevue Master elected not to contract with Northwest for that work. It goes back to the first point I made when I stood up here. We're chasing our tail here. This case was litigated. We're chasing our tail to some extent one could say, but the honest truth is we're really trying to suggest what happened in 2001 and how does that affect what we have here. That's what we're really looking at. And whether the plaintiff has had adequate time, if we're talking only about the discovery issue, whether that party has had adequately time to do the discovery it needs to make sure we're where we need to go given the situation. Let me address what happened in 2001, and that discussion is going to take me into the certificates of insurance that counsel is alluding to. Keep in mind that I'm going to begin by the discussion of the Lincoln Square project, its commencement and its completion. And in my study of the record before argument here, I couldn't pick up a date in the record when the Lincoln Square project started, nor could I pick up a date where it ended. I can pick up that it was underway in 2000 and it was not complete in 2003. And we know that Northwest Tower had the job to install and dismantle the tower cranes. As you know, when you're building high-rise construction, as you're coming out of the ground and going up into the sky, you need those tower cranes installed, and those tower cranes remain in place until near completion. And Northwest understood its obligation to make Bellevue an additional insured at that time, the time they were doing that work, did they not? I mean, that's evidenced by the fact that they did so. I disagree with you, Your Honor, but I want to explain why I disagree with you. But I'm going to go there next. But I want to leave you with the thought that keep in mind if we're talking tower cranes here, which I'm which I'm telling you is irrelevant, but Northwest Tower had the job to install and dismantle. They don't dismantle until sometime after 2003 or sometime after 2003. So they install in 2001, dismantle sometime later. Okay, now going to your question, you're drawing that inference, I believe, based on these certificates of insurance. The certificates of insurance, they're issued for informational purposes. They're largely evidence of proof of insurance. They are not contract documents. They are neither an insurance policy nor a job contract. Mr. Bede. We're trying to determine whether Judge Peckman's ruling was provident that there was no genuine issue of material fact on this. Right. We're not making a final determination. Right. And I want to respond to that observation if I could finish my thought about the certificates of insurance. But I think opposing counsel agrees they're not contracts. And that's you can see that in page 34 of their opening brief. These certificates of insurance are not requested or issued by people with contracting authority or having any knowledge about the terms of the job contract. They're issued by clerks or requested by clerks in Northwest Tower's office and sent to a broker and a clerk in the broker's office issues. Under these circumstances of evidence, the mutual assent of the parties. I realize it's not a four-quarters contract. It would be nice if we had that in every case. I'm just trying to make the point that they're not contract documents and people with contracting authority are not dealing with them and they're and people are requesting it and writing them don't have knowledge about the contract terms, the job contract terms. The other important point here is they're arguing from a 2001 certificate of insurance to contract with. Which was repeated in 2002 and 2003, wasn't it? Because remember what I said about when did the project complete? You're not going to dismantle those tower cranes until job completion. So whenever you renew your insurance, you send an additional proof of insurance. And I think another point, they're arguing from a 2001 certificate of insurance. This champion elevator contract was April 2002. Was there any doubt that in 2001 there was insurance and there was an insurance contract? Something. There's no doubt that in 2001, Northwest had its own insurance. There is no evidence in this record of the contract between Northwest and Bellevue Master for the tower cranes. And there is no evidence that that contract contained an obligation to provide AI coverage. We don't even have the contract, let alone being able to speak to what the terms of it were. Northwest in your view never had any kind of a contract of insurance that covered Bellevue. Not at all. And let me state a little differently. There's no evidence of that. And the evidence that we have is that the arrangement for the installation and dismantling of the tower cranes, which was the only contract that Northwest had with Bellevue Master, was verbal. And knowing the lack of sophistication of Northwest, they take these jobs by telephone, they quote a price, they work out the schedule and the delivery, and that's the extent of what's what's discussed. If if if if Bellevue Master wants proof of insurance, they get their little office manager sending out a note to somebody in the office at Northwest Tower and the paperwork is cranked out. It's a different question as to whether a contract requires additional insured coverage. You know, I think I could wrap up now. And I just want to leave you with this thought. Well, could you address the 56F before you do? The timing on that, the actions in federal court in September, as I understand it, of 07? No, it's in it's in federal court order in September. But Ms. Beatty argued that as of September, the initial discovery was propounded, I think it was. And the summary judgment rulings made in March of the following year. Yeah. And what discovery was conducted? When we defense counsel representing Northwest Tower and the underlying action, that case was exhaustively discovered. All the depositions that you're seeing in this record were conducted in that underlying case. When I went out and collected all the records for this, for this proceeding, I didn't go to Northwest Tower to do that. I went to defense counsel's office. Colson O'Connor here in Seattle. And he had a room full of boxes, the pleadings, the correspondence, all the job records produced by all the parties, Department of Labor and Industry files and records and binders. And I gathered all of that stuff up and brought it back to my office where opposing counsel had the opportunity to comb through that and look through whatever they wanted to have. And to make certain I had everything, I went out to Northwest Tower later and said, you got anything left that defense counseling underlying case didn't take out of your office? They found a few more things, which I also provided. I'm not I'm not clear. They said Westchester owed them an underwriting file. My memory is that we produced that. I could be wrong, but I don't know. So what? I mean, what's an underwriting file going to have to do with the issues we got in this case right here? Well, my worry, I guess, is this. It seemed to me putting this timeline together the best I could from the time of the initial disclosures in this particular case until the time of the summary judgment motion, there were only four months that had gone by. And therefore, with only having four months gone by, Americans submits an affidavit setting forth evidence it needs to discover and the suggested information that would be obtained.  Now, the court on that basis, and I agree it's an abuse of discretion basis, and I've been an old trial judge, so I'm not anxious to undo what Judge Pickman did. My worry is that the court really ignored that affidavit and focused not on the affidavit, but on the speculative nature of the existence of a written contract, which it may be speculative. I'm not suggesting, and I may be even in your corner on that particular issue. But my worry is that on that record, with information, as I understand, based on what I've read in her brief, outstanding discovery from your area, also necessary, though Judge Pickman's looked at that too, that we need to worry about abuse of discretion on that issue, because we're on summary judgment here, and the order setting the trial date, the relating parties said they had until May 19th of 2008 even to complete discovery. Judge Smith, you've got to remember that this case, the underlying case, was settled in 2004. This case was started in 2006, almost two years later. There was a question you had to opposing counsel on this 56th. You commented on facts and the possession of an opposing party. Here in this case, Bellevue Master is a party to this supposed contract, if it exists, if it's in their possession. And they had two years before filing this case to garner the evidence to support their allegations. They should never have even filed this case. We shouldn't even be talking about discovery. They should not have filed this case unless they had substantial evidence of a contract providing AI coverage to Bellevue Master. Thank you. Thank you for your argument, sir. You have 25 seconds, I guess. Okay. He said no to your question, did Northwest get AI coverage for Bellevue Master. Mr. Weber testified yes at his deposition that coverage was in place for Bellevue Master throughout the length of the project. The documents he's talking about, my partner, Barbara Brady, had to get those out of a construction trailer in Bellevue after Mr. Olson said they didn't exist. I think I'm done with my 25 seconds. Well, thank you very much. American Guarantee v. Westchester Surplus Lines, Case 08-35264 is submitted. We'll now hear Case 08-35410, Hochberg v. Lincare.
judges: Canby, Smith N. R., Pro